# KOONS BUICK PONTIAC GMC, INC. *v.* NIGH

No. 03–377.   Argued October 5, 2004—Decided November 30, 2004

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, in which BREYER, J., joined, *post*, p. 65. KENNEDY, J., filed a concurring opinion, in which REHNQUIST, C. J., joined, *post*, p. 66. THOMAS, J., filed an opinion concurring in the judgment, *post*, p. 67. SCALIA, J., filed a dissenting opinion, *post*, p. 70.

*Donald B. Ayer* argued the cause for petitioner. With him on the briefs were *William K. Shirey II* and *Arthur M. Schwartzstein.*

*A. Hugo Blankingship III* argued the cause for respondent. With him on the brief were *Allison M. Zieve* and *Brian Wolfman.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *Roy T. Englert, Jr., Alan E. Untereiner,* and *Max Huffman;* for the Michigan Bankers Association by *John J. Bursch;* for the National Automobile Dealers Association by *Paul R. Norman;* and

JUSTICE GINSBURG delivered the opinion of the Court.

The meaning of a subparagraph in a section of the Truth in Lending Act (TILA or Act), 15 U. S. C. § 1601 *et seq.*, is at issue in this case. As originally enacted in 1968, the provision in question bracketed statutory damages for violations of TILA prescriptions governing consumer loans: $100 was made the minimum recovery and $1,000, the maximum award. In 1995, Congress added a new clause increasing recovery for TILA violations relating to closed-end loans "secured by real property or a dwelling." § 1640(a)(2)(A)(iii). In lieu of the $100/$1,000 minimum and maximum recoveries, Congress substituted $200/$2,000 as the floor and ceiling.

Less-than-meticulous drafting of the 1995 amendment created an ambiguity. A divided panel of the United States Court of Appeals for the Fourth Circuit held that the 1995 amendment not only raised the statutory damages recoverable for TILA violations involving real-property-secured loans, it also removed the $1,000 cap on recoveries involving loans secured by personal property. We reverse that determination and hold that the 1995 amendment left unaltered the $100/$1,000 limits prescribed from the start for TILA violations involving personal-property loans. The purpose of the 1995 amendment is not in doubt: Congress meant to raise the minimum and maximum recoveries for closed-end loans secured by real property. There is scant indication that Congress simultaneously sought to remove the $1,000 cap on loans secured by personal property.

I

Congress enacted TILA in 1968, as part of the Consumer Credit Protection Act, Pub. L. 90–321, 82 Stat. 146, as

for the Virginia Automobile Dealers Association et al. by *Michael G. Charapp, Brad D. Weiss,* and *Allen Jones, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the Commercial Law League of America by *Manuel H. Newburger* and *Barbara M. Barron;* and for the National Association of Consumer Advocates et al. by *Richard J. Rubin* and *Joanne S. Faulkner.*

amended, 15 U. S. C. § 1601 *et seq.*, to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit," § 102, codified in 15 U. S. C. § 1601(a). The Act requires a creditor to disclose information relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights, see §§ 1631–1632, 1635, 1637–1639, and it prescribes civil liability for any creditor who fails to do so, see § 1640. As originally enacted in 1968, the Act provided for statutory damages of twice the finance charge in connection with the transaction, except that recovery could not be less than $100 or greater than $1,000.[1] The original civil-liability provision stated:

> "(a) [A]ny creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this chapter to be disclosed to that person is liable to that person in an amount . . . of
>
> "(1) twice the amount of the finance charge in connection with the transaction, except that liability under this paragraph shall not be less than $100 nor greater than $1,000 . . . ." Pub. L. 90–321, § 130, 82 Stat. 157.

In 1974, Congress amended TILA's civil-liability provision, 15 U. S. C. § 1640(a), to allow for the recovery of actual damages in addition to statutory damages and to provide separate statutory damages for class actions. Pub. L. 93–495, § 408(a), 88 Stat. 1518. Congress reworded the original statutory damages provision to limit it to individual actions, moved the provision from § 1640(a)(1) to § 1640(a)(2)(A), and retained the $100/$1,000 brackets on recovery. In order to account for the restructuring of the statute, Congress

---

[1] The finance charge is determined, with certain exceptions, by "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U. S. C. § 1605(a).

changed the phrase "under this paragraph" to "under this subparagraph." The amended statute provided for damages in individual actions as follows:

"(a) [A]ny creditor who fails to comply with any requirement imposed under this chapter . . . is liable to such person in an amount equal to the sum of—
"(1) any actual damage sustained by such person as a result of the failure;
"(2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000 . . . ." § 408(a), 88 Stat. 1518.

A further TILA amendment in 1976 applied truth-in-lending protections to consumer leases. Consumer Leasing Act of 1976, 90 Stat. 257. Congress inserted a clause into § 1640(a)(2)(A) setting statutory damages for individual actions relating to consumer leases at 25% of the total amount of monthly payments under the lease. Again, Congress retained the $100/$1,000 brackets on statutory damages. The amended § 1640(a)(2)(A) provided for statutory damages equal to

"(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease . . . 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000 . . . ." Pub. L. 94–240, § 4(2), 90 Stat. 260, codified in 15 U. S. C. § 1640(a) (1976 ed.).

Following the insertion of the consumer lease provision, courts consistently held that the $100/$1,000 limitation remained applicable to all consumer financing transactions,

whether lease or loan. See, *e. g., Purtle* v. *Eldridge Auto Sales, Inc.*, 91 F. 3d 797, 800 (CA6 1996); *Cowen* v. *Bank United of Tex., FSB*, 70 F. 3d 937, 941 (CA7 1995); *Mars* v. *Spartanburg Chrysler Plymouth, Inc.*, 713 F. 2d 65, 67 (CA4 1983); *Dryden* v. *Lou Budke's Arrow Finance Co.*, 661 F. 2d 1186, 1191, n. 7 (CA8 1981) *(per curiam); Williams* v. *Public Finance Corp.*, 598 F. 2d 349, 358, 359, n. 17 (CA5 1979).

In 1995, Congress amended TILA's statutory damages provision once more. The 1995 amendment, which gave rise to the dispute in this case, added a new clause (iii) at the end of § 1640(a)(2)(A), setting a $200 floor and $2,000 ceiling for statutory damages in an individual action relating to a closed-end credit transaction "secured by real property or a dwelling." Truth in Lending Act Amendments of 1995, Pub. L. 104–29, § 6, 109 Stat. 274. These closed-end real estate loans, formerly encompassed by clause (i), had earlier been held subject to the $100/$1,000 limitation. See, *e. g., Mayfield* v. *Vanguard Sav. & Loan Assn.*, 710 F. Supp. 143, 146 (ED Pa. 1989) (ordering "the maximum statutory award of $1,000" for each TILA violation concerning a secured real estate loan). Section 1640(a), as amended in 1995, thus provides for statutory damages equal to

> "(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease . . . 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000, or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000 . . . ."

Shortly after the passage of the 1995 TILA amendments, the Office of the Comptroller of the Currency issued an official policy announcement describing the changes. With respect to changes in TILA's civil-liability provisions, the announcement stated only that "[p]unitive damages have been increased for transactions secured by real property or a dwelling from a maximum of $1,000 to a maximum of $2,000 *(closed-end credit only)*." Administrator of National Banks, Truth in Lending Act Amendments of 1995, OCC Bulletin 96–1, p. 2 (Jan. 5, 1996).

In 1997, the Seventh Circuit, in *Strange* v. *Monogram Credit Card Bank of Ga.*, 129 F. 3d 943, held that the meaning of clauses (i) and (ii) remained untouched by the addition of clause (iii). The Seventh Circuit observed that prior to the addition of clause (iii) in 1995, "[c]ourts uniformly interpreted the final clause, which established the $100 minimum and the $1,000 maximum, as applying to both (A)(i) and (A)(ii)." *Id.*, at 947. The 1995 amendment, the Seventh Circuit reasoned, "was designed simply to establish a more generous minimum and maximum for certain secured transactions, without changing the general rule on minimum and maximum damage awards for the other two parts of § 1640(a)(2)(A)." *Ibid.* As *Strange* illustrates, TILA violations may involve finance charges that, when doubled, are less than $100. There, double-the-finance-charge liability was $54.27, entitling the plaintiff to the $100 minimum. *Id.*, at 945, 947.

## II

On February 4, 2000, respondent Bradley Nigh attempted to purchase a used 1997 Chevrolet Blazer truck from petitioner Koons Buick Pontiac GMC. Nigh traded in his old vehicle and signed a buyer's order and a retail installment sales contract reflecting financing to be provided by Koons Buick. 319 F. 3d 119, 121–122 (CA4 2003). Koons Buick could not find a lender to purchase an assignment of the pay-

ments owed under the sales contract and consequently restructured the deal to require a larger downpayment. *Id.*, at 122. On February 25, after Koons Buick falsely told Nigh that his trade-in vehicle had been sold, Nigh signed a new retail installment sales contract. *Ibid.* Once again, however, Koons Buick was unable to find a willing lender. *Ibid.* Nigh ultimately signed, under protest, a third retail installment sales contract. *Ibid.*

Nigh later discovered one reason why Koons Buick had been unable to find an assignee for the installment payments due under the second contract: That contract contained an improperly documented charge of $965 for a Silencer car alarm Nigh never requested, agreed to accept, or received. *Ibid.* Nigh made no payments on the Blazer and returned the truck to Koons Buick. *Id.*, at 123.

On October 3, 2000, Nigh filed suit against Koons Buick alleging, among other things, a violation of TILA. Nigh sought uncapped recovery of twice the finance charge, an amount equal to $24,192.80. Koons Buick urged a $1,000 limitation on statutory damages under § 1640(a)(2)(A)(i). The District Court held that damages were not capped at $1,000, and the jury awarded Nigh $24,192.80 (twice the amount of the finance charge). *Id.*, at 121; App. in No. 01–2201 etc. (CA4), pp. 653–655, 670, 756–757, 764.

A divided panel of the Fourth Circuit affirmed. 319 F. 3d, at 126–129. The Court of Appeals acknowledged that it had previously interpreted the $1,000 cap to apply to clauses (i) and (ii). *Id.*, at 126; see *Mars* v. *Spartanburg Chrysler Plymouth, Inc.*, 713 F. 2d, at 67. But the majority held that "by striking the 'or' preceding (ii), and inserting (iii) after the 'under this subparagraph' phrase," Congress had "rendered *Mars*' interpretation defunct." 319 F. 3d, at 126. According to the majority: "The inclusion of the new maximum and minimum in (iii) shows that the clause previously interpreted to apply to all of (A), can no longer apply to (A), but must now apply solely to (ii), so as not to render meaningless

the maximum and minimum articulated in (iii)." *Id.*, at 127.[2] The Court of Appeals therefore allowed Nigh to recover the full uncapped amount of $24,192.80 under clause (i).

Judge Gregory dissented. The new clause (iii), he stated, operates as a specific "carve-out" for real estate transactions from the general rule establishing the $100/$1,000 liability limitation. *Id.*, at 130, 132. Both parties acknowledged, and it was Fourth Circuit law under *Mars*, 713 F. 2d 65, that, before 1995, the $100/$1,000 brackets applied to the entire subparagraph. 319 F. 3d, at 130. Judge Gregory found "no evidence that Congress intended to override the Fourth Circuit's long-standing application of the $1,000 cap to both (2)(A)(i) and (2)(A)(ii)." *Id.*, at 131. If the $1,000 cap applied only to clause (ii), the dissent reasoned, the phrase "under this subparagraph" in clause (ii) would be "superfluous," because "the meaning of (ii) would be unchanged by its deletion." *Id.*, at 132. Moreover, Judge Gregory added, limiting the $1,000 cap to recoveries for consumer leases under clause (ii) would create an inconsistency within the statute: The damages cap in clause (ii) would include the "under this subparagraph" modifier, but the cap in clause (iii) would not. *Ibid.*[3]

We granted certiorari, 540 U. S. 1148 (2004), to resolve the division between the Fourth Circuit and the Seventh Circuit on the question whether the $100 floor and $1,000 ceiling apply to recoveries under § 1640(a)(2)(A)(i). We now re-

---

[2] The dissent adopts a similar structural argument to justify its conclusion that the $100/$1,000 brackets apply only to recoveries under clause (ii). See *post*, at 70–71.

[3] Judge Gregory noted that the phrase "under this subparagraph," as it appears in § 1640(a)(2)(B), covering statutory damages in class actions, "indisputably applies to all of subparagraph (B)." 319 F. 3d 119, 132 (CA4 2003). "[T]he most logical interpretation of the statute," he concluded, "is to read the phrase 'under this subparagraph' as applying generally to an entire subparagraph, either (A) or (B), and to read (2)(A)(iii) as creating a specific carve-out from that general rule for real-estate transactions." *Ibid.*

verse the judgment of the Court of Appeals for the Fourth Circuit.

III

Statutory construction is a "holistic endeavor." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988); accord *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 455 (1993); *Smith* v. *United States*, 508 U. S. 223, 233 (1993). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.*, 484 U. S., at 371 (citations omitted); see also *McCarthy* v. *Bronson*, 500 U. S. 136, 139 (1991) (statutory language must be read in its proper context and not viewed in isolation). In this case, both the conventional meaning of "subparagraph" and standard interpretive guides point to the same conclusion: The $1,000 cap applies to recoveries under clause (i).

Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections. See L. Filson, The Legislative Drafter's Desk Reference 222 (1992) (hereinafter Desk Reference). This hierarchy is set forth in drafting manuals prepared by the legislative counsel's offices in the House and the Senate. The House manual provides:

"To the maximum extent practicable, a section should be broken into—
"(A) subsections (starting with (a));
"(B) paragraphs (starting with (1));
"(C) subparagraphs (starting with (A));
"(D) clauses (starting with (i)) . . . ." House Legislative Counsel's Manual on Drafting Style, HLC No. 104–1, p. 24 (1995).

The Senate manual similarly provides:

"A section is subdivided and indented as follows:
  "(a) SUBSECTION.—
    "(1) PARAGRAPH.—
      "(A) SUBPARAGRAPH.—
        "(i) CLAUSE.—" Senate Office of the Legislative Counsel, Legislative Drafting Manual 10 (1997).[4]

Congress followed this hierarchical scheme in drafting TILA. The word "subparagraph" is generally used to refer to a subdivision preceded by a capital letter,[5] and the word "clause" is generally used to refer to a subdivision preceded by a lower case Roman numeral.[6] Congress applied this hierarchy in § 1640(a)(2)(B), which covers statutory damages in TILA class actions and states: "[T]he total recovery *under this subparagraph* . . . shall not be more than the lesser

---

[4] These congressional drafting manuals, both postdating the 1995 TILA amendment, are consistent with earlier guides. See, *e. g.*, Desk Reference 222 ("Federal statutes . . . are always broken down successively into . . . subparagraphs (starting with subparagraph (A)), [and] clauses (starting with clause (i)) . . . ."); D. Hirsch, Drafting Federal Law § 3.8, p. 27 (2d ed. 1989) ("Paragraphs are divided into tabulated lettered subparagraphs ('(A)', '(B)', etc.) . . . . Subparagraphs are divided into clauses bearing small roman numerals ('(i)', '(ii)', '(iii)', '(iv)') . . . ."); R. Dickerson, The Fundamentals of Legal Drafting § 8.25, p. 197 (2d ed. 1986) ("For divisions of a paragraph (called 'subparagraphs'), use '(A),' '(B),' '(C),' etc. . . . When an additional designated breakdown is necessary, use '(i),' '(ii),' '(iii),' etc."); J. Peacock, Notes on Legislative Drafting 12 (1961) (paragraphs divided into "*sub-paragraphs* designated (A), (B), (C)," and subparagraphs further divided into "*clauses* (i), (ii), (iii)").

[5] *E. g.*, 15 U. S. C. § 1602(aa)(2)(A) ("under this subparagraph"); § 1602(aa)(2)(B) ("under subparagraph (A)"); § 1605(f)(2)(A) ("except as provided in subparagraph (B)"); § 1615(c)(1)(B) ("pursuant to subparagraph (A)"); § 1637(c)(4)(D) ("in subparagraphs (A) and (B)"). But see § 1637a(a)(6)(C) ("subparagraph" appears not to refer to a capital-letter subdivision).

[6] *E. g.*, § 1637(a)(6)(B)(ii) ("described in clause (i)"); § 1637a(a)(8)(B) ("described in clauses (i) and (ii) of subparagraph (A)"); § 1640(i)(1)(B)(ii) ("described in clause (i)").

of $500,000 or 1 per centum of the net worth of the creditor . . . ." (Emphasis added.) In 1995, Congress plainly meant "to establish a more generous minimum and maximum" for closed-end mortgages. *Strange*, 129 F. 3d, at 947. On that point, there is no disagreement. Had Congress simultaneously meant to repeal the longstanding $100/$1,000 limitation on § 1640(a)(2)(A)(i), thereby confining the $100/$1,000 limitation solely to clause (ii), Congress likely would have flagged that substantial change. At the very least, a Congress so minded might have stated in clause (ii): "liability under this clause."

The statutory history resolves any ambiguity whether the $100/$1,000 brackets apply to recoveries under clause (i).[7] Before 1995, clauses (i) and (ii) set statutory damages for the entire realm of TILA-regulated consumer credit transactions. Closed-end mortgages were encompassed by clause (i). See, *e. g., Mayfield* v. *Vanguard Sav. & Loan Assn.*, 710 F. Supp., at 146. As a result of the addition of clause (iii), closed-end mortgages are subject to a higher floor and ceiling. But clause (iii) contains no other measure of damages. The specification of statutory damages in clause (i) of twice the finance charge continues to apply to loans secured by real property as it does to loans secured by personal property.[8] Clause (iii) removes closed-end mortgages from clause (i)'s governance only to the extent that clause (iii) prescribes $200/$2,000 brackets in lieu of $100/$1,000.[9]

---

[7] The five separate writings this Court has produced demonstrate that § 1640(a)(2)(A) is hardly a model of the careful drafter's art.

[8] In consumer credit transactions in which a security interest is taken in the borrower's principal dwelling, the borrower also has a right to rescission under certain circumstances. § 1635.

[9] The dissent's reading, we note, hinges on an assumed alteration in Congress' design, assertedly effected by the bare addition of "(iii)" and the transposition of "or." See *post*, at 71–72, and n. 1. If Congress had not added "(iii)" when it raised the cap on recovery for closed-end mortgages, the meaning of the amended text would be beyond debate. The limitations provision would read: "except that the liability under this subpara-

There is scant indication that Congress meant to alter the meaning of clause (i) when it added clause (iii).   Cf. *Church of Scientology of Cal.* v. *IRS*, 484 U. S. 9, 17–18 (1987) ("All in all, we think this is a case where common sense suggests, by analogy to Sir Arthur Conan Doyle's 'dog that didn't bark,' that an amendment having the effect petitioner ascribes to it would have been differently described by its sponsor, and not nearly as readily accepted by the floor manager of the bill.").   By adding clause (iii), Congress sought to provide *increased recovery* when a TILA violation occurs in the context of a loan secured by real property.   See, *e. g.,* H. R. Rep. No. 104–193, p. 99 (1995) ("[T]his amendment increases the statutory damages available in closed end credit transactions secured by real property or a dwelling . . . ."). But cf. *post,* at 75 (SCALIA, J., dissenting) (hypothesizing that far from focusing on *raising* damages recoverable for closed-end mortgage transactions, Congress may have "focus[ed] more intently on limiting damages" for that category of loans).   "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen* v. *Ward,* 279 U. S. 337, 339 (1929) (Holmes, J.).   It would be passing strange to read the statute to cap recovery in connection with a closed-end, real-property-secured loan at an amount *substantially lower* than the recovery available when a violation occurs in the context of a personal-property-secured loan or an open-end, real-property-secured loan.[10]   The text does not dictate this result; the statutory

---

graph shall not be less than $100 nor greater than $1,000, or in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000."

[10] This reading would lead to the anomalous result of double-the-finance-charge liability, uncapped by the fixed dollar limit, under clause (i) for an open-end loan secured by real property, while liability would be capped by clause (iii) at $2,000 for a closed-end loan secured by the same real property.   TILA does not in general apply to credit transactions in which the total amount financed exceeds $25,000, but this limit does not

history suggests otherwise; and there is scant indication Congress meant to change the well-established meaning of clause (i).

*       *       *

For the reasons stated, the judgment of the Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

apply to loans "secured by real property or a dwelling." 15 U. S. C. § 1603. Double-the-finance-charge liability under clause (i) for a TILA violation in connection with an open-end, real-property-secured loan (*e. g.,* a home equity line of credit), could far exceed the $2,000 liability cap under clause (iii) for a TILA violation in connection with a standard closed-end home mortgage.

The dissent states that fixed mortgages are more prevalent than home equity lines of credit and that the mean home equity line of credit balance is considerably smaller than the mean first mortgage balance. *Post,* at 74–75. But even under the dissent's reading, a borrower stands to collect greater statutory damages if a TILA violation occurs in connection with a home equity line of credit than if it occurs in connection with a home mortgage acquisition loan. According to figures compiled by the Consumer Bankers Association and the Federal Reserve Board, in 2004 the average new home equity line of credit was $77,526, see Consumer Bankers Assn., CBA news release, Home Equity Lines Adjust on Prime Rate Change, Nov. 10, 2004, available at http://www.cbanet.org/news/press%20releases/home_equity/prime_rate_adjust.htm (as visited Nov. 15, 2004, and available in Clerk of Court's case file), and about a third of extended credit lines are mostly or fully in use, see G. Canner, T. Durkin, & C. Luckett, Recent Developments in Home Equity Lending, 84 Fed. Res. Bull. 241, 247 (Apr. 1998) (30% of home equity lines of credit 75%–100% in use in 1997). Assuming, as the dissent does, a 10% annual interest rate, the annual finance charge could easily surpass $7,000, and double-the-finance-charge liability would substantially exceed the $2,000 cap prescribed for home mortgage loans. Additionally, the dissent's observation does not address the anomaly, illustrated by the facts of this case, of providing full double-the-finance-charge liability for recoveries under clause (i), while capping recoveries under clause (iii). Nigh was awarded over $24,000 in damages for a violation involving a car loan. Had similar misconduct occurred in connection with a home mortgage, he would have received no more than $2,000 in statutory damages.

JUSTICE STEVENS, with whom JUSTICE BREYER joins, concurring.

If an unambiguous text describing a plausible policy decision were a sufficient basis for determining the meaning of a statute, we would have to affirm the judgment of the Court of Appeals. The ordinary reader would think that 15 U. S. C. § 1640(a)(2)(A) is a paragraph including three subparagraphs identified as (i), (ii), and (iii). There is nothing implausible about a scheme that uses a formula to measure the maximum recovery under (i) without designating a ceiling or floor. Thus we cannot escape this unambiguous statutory command by proclaiming that it would produce an absurd result.

We can, however, escape by using common sense. The history of the provision makes it perfectly clear that Congress did not intend its 1995 amendment adding (iii) to repeal the pre-existing interpretation of (i) as being limited by the ceiling contained in (ii). Thus, the Court unquestionably decides this case correctly. It has demonstrated that a busy Congress is fully capable of enacting a scrivener's error into law.

In recent years the Court has suggested that we should only look at legislative history for the purpose of resolving textual ambiguities or to avoid absurdities. It would be wiser to acknowledge that it is always appropriate to consider all available evidence of Congress' true intent when interpreting its work product.[1] Common sense is often

[1] See *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597, 611, n. 4 (1991) ("[C]ommon sense suggests that inquiry benefits from reviewing additional information rather than from ignoring it"); *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543–544 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'" (footnote omitted)); *United States* v. *Fisher*, 2 Cranch 358, 386 (1805) (Marshall, C. J.) ("Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived"). We execute our duty as judges

more reliable than rote repetition of canons of statutory construction.[2]  It is unfortunate that wooden reliance on those canons has led to unjust results from time to time.[3]  Fortunately, today the Court has provided us with a lucid opinion that reflects the sound application of common sense.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, concurring.

In the case before us, there is a respectable argument that the statutory text, 15 U. S. C. § 1640(a)(2)(A)(ii), provides unambiguous instruction in resolving the issue: The word "subparagraph" directs that the $1,000 cap applies to recoveries under both clause (A)(i) and clause (A)(ii), as both fall under subparagraph (A).  Were we to adopt that analysis, our holdings in cases such as *Lamie* v. *United States Trustee*, 540 U. S. 526, 533–535 (2004), *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992), and *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241–242 (1989), would be applicable, absent a showing that the result made little or no sense.

The Court properly chooses not to rest its holding solely on the words of the statute.  That is because of a counterargument that "subparagraph" cannot be read straightforwardly to apply to all of subparagraph (A) in light of the different recovery cap of $2,000 for recoveries under clause (A)(iii).  I agree with the Court's decision to proceed on the premise that the text is not altogether clear.  That means that examination of other interpretive resources, including

---

most faithfully when we arrive at an interpretation only after "seek[ing] guidance from every reliable source."  A. Barak, Judicial Discretion 62 (Y. Kaufmann transl. 1989).

[2] See Stevens, The Shakespeare Canon of Statutory Construction, 140 U. Pa. L. Rev. 1373, 1383 (1992).

[3] See, *e. g.*, *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438 (2002); *United States* v. *James*, 478 U. S. 597 (1986); *United States* v. *Locke*, 471 U. S. 84 (1985).

predecessor statutes, is necessary for a full and complete understanding of the congressional intent. This approach is fully consistent with cases in which, because the statutory provision at issue had only one plausible textual reading, we did not rely on such sources. In the instant case, the Court consults extratextual sources and, in my view, looking to these materials confirms the usual interpretation of the word "subparagraph."

With these observations, I join the Court's opinion.

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that the judgment of the Court of Appeals should be reversed. I write separately, however, because I believe that it is unnecessary to rely on inferences from silence in the legislative history or the perceived anomalous results posed by an alternative interpretation to answer the question presented in this case. See *ante*, at 63, and n. 10. Instead, in my view, the text of 15 U. S. C. § 1640(a)(2)(A) prior to Congress' 1995 amendment to it, the consistent interpretation that the Courts of Appeals had given to the statutory language prior to the amendment, and the text of the amendment itself make clear that Congress tacked on a provision addressing a very specific set of transactions otherwise covered by the Truth in Lending Act (TILA) but not materially altering the provisions at issue here.

If the text in this case were clear, resort to anything else would be unwarranted. See *Lamie* v. *United States Trustee*, 540 U. S. 526, 532–533 (2004). But I agree with the Court that § 1640(a)(2)(A) is ambiguous, *ante*, at 53, rather than unambiguous as JUSTICE STEVENS contends, *ante*, at 65 (concurring opinion), because on its face it is susceptible of several plausible interpretations. Congress, as the Court points out, used "'subparagraph'" consistently in TILA, albeit not with perfect consistency, to refer to a third-level division introduced by a capital letter. See *ante*, at 60–62,

and n. 4. This consistent usage points toward the view that "subparagraph" here refers to the whole of subdivision (A). But other textual evidence is in tension with that reading. As the Court of Appeals correctly pointed out and JUSTICE SCALIA notes, *post*, at 72 (dissenting opinion), if "subparagraph" refers to the whole of subdivision (A), the limit of $100–$1,000 for liability set forth in clause (ii) is in direct conflict with the $200–$2,000 limit on liability found in clause (iii). 319 F. 3d 119, 126–127 (CA4 2003). Still other textual clues point away from the Court of Appeals' reading. It is possible, for example, to read the $100–$1,000 limit in clause (ii) to be an exception that applies only to the liability set forth in clauses (i) and (ii), since it comes after clauses (i) and (ii) but before clause (iii). These conflicting textual indicators show that, whatever the practices suggested in the manuals relied upon by the Court, *ante*, at 60–61, and n. 4, § 1640(a)(2)(A) is not a model of the best practices in legislative drafting.

The statutory history of § 1640(a)(2)(A) resolves this ambiguity. Prior to the 1995 amendment, the meaning of subdivisions (A)(i) and (ii) was clear. As the Court recounts, after the 1976 amendment and prior to 1995, § 1640(a) provided for statutory damages equal to

> "(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease . . . 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000." 15 U. S. C. § 1640(a) (1976 ed.).

See *ante*, at 55. There is no doubt that under this version of the statute the phrase "under this subparagraph" extended the liability limits to subdivision (A)(i) as well as subdivision (A)(ii). As noted above, "subparagraph" is gener-

ally used in TILA to refer to a section's third-level sub-division introduced by a capital letter. By virtue of the phrase "under this subparagraph," the liability extended to the whole of subdivision (A). The placement of this clause at the end of subdivision (A) further indicated that it was meant to refer to the whole of subdivision (A). The clarity of the meaning is borne out by the Courts of Appeals' consistent application of the limit to both clauses (i) and (ii) as they stood before the 1995 amendment. *Purtle* v. *Eldridge Auto Sales, Inc.*, 91 F. 3d 797, 800 (CA6 1996); *Cowen* v. *Bank United of Tex., FSB*, 70 F. 3d 937, 941 (CA7 1995); *Mars* v. *Spartanburg Chrysler Plymouth, Inc.*, 713 F. 2d 65, 67, and n. 6 (CA4 1983); *Dryden* v. *Lou Budke's Arrow Finance Co.*, 661 F. 2d 1186, 1191, n. 7 (CA8 1981) *(per curiam); Williams* v. *Public Finance Corp.*, 598 F. 2d 349, 359, and n. 17 (CA5 1979).

Congress' 1995 amendment did not materially alter the text of § 1640(a)(2)(A)(i) or (ii). It removed "or" between clauses (i) and (ii) and placed it between clause (ii) and the new clause (iii). Pub. L. 104–29, §6, 109 Stat. 274. Apart from this change, it neither deleted any language from clause (i) or clause (ii) nor added any language to these clauses. The only substantive change that amendment wrought was the creation of clause (iii), which established a higher $2,000 cap on damages for a very specific set of credit transactions—closed-end credit transactions secured by real property or a dwelling—that had previously been covered by § 1640(a)(2)(A)(i) and subject to the lower $1,000 cap. *Ibid.* By so structuring the amendment, Congress evinced its intent to address only the creation of a different limit for a specific set of transactions.

In light of this history, as well as the text's clear meaning prior to the 1995 amendment and the lower courts' consistent application of the limit in clause (ii) to clause (i) prior to the 1995 amendment, the limit in clause (ii) remains best read as applying also to clause (i).

JUSTICE SCALIA, dissenting.

The Court views this case as a dispute about the meaning of "subparagraph" in 15 U. S. C. § 1640(a)(2)(A). I think it involves more than that. For while I agree with the construction of that word adopted by the Court, see *ante*, at 60–62, by JUSTICE KENNEDY, see *ante*, at 66–67 (concurring opinion), and by JUSTICE THOMAS, see *ante*, at 67–68 (opinion concurring in judgment), I disagree with the conclusion that the Court believes follows. The ultimate question here is not the meaning of "subparagraph," but the scope of the exception which contains that term. When is "liability under this subparagraph" limited by the $100/$1,000 brackets? In answering that question, I would give dispositive weight to the structure of § 1640(a)(2)(A), which indicates that the exception is part of clause (ii) and thus does not apply to clause (i).

After establishing the fact that "subparagraph" refers to a third-level subdivision within a section, denominated by a capital letter (here subparagraph (A)), see *ante*, at 60–62, the Court's analysis proceeds in five steps. First, the Court presumes that this fact determines the scope of the exception. See *ante*, at 62. It does not. In context, the reference to "liability under this subparagraph" is indeterminate. Since it is not a freestanding limitation, but an exception to the liability imposed by clause (ii), it is quite possible to read it as saying that, *in the consumer-lease cases covered by clause (ii)*, "the liability under this subparagraph" would be subject to the $100/$1,000 brackets. Using "subparagraph" in that way would hardly be nonsensical, since the *only* liability under subparagraph (A) that applies to consumer-lease cases is the amount of damages specified by clause (ii). In other words, if the exception is part of clause (ii), then "liability under this subparagraph" is actually synonymous with "liability under this clause," cf. *ibid.*, in the sense that either phrase would have the same effect were it to appear in clause

(ii). As a result, the term "subparagraph" cannot end our inquiry.

The structure of subparagraph (A) provides the best indication of whether the exception is part of clause (ii). In simplified form, the subparagraph reads: "(i) . . . , (ii) . . . , or (iii) . . . ." Clauses (i), (ii), and (iii) are separated by commas, and an "or" appears before clause (iii). It is reasonable to conclude that the exception—which appears between "(ii)" and the comma that precedes "or (iii)"—is part of clause (ii). In fact, the Court admits in passing that the exception appears "*in* clause (ii)." *Ibid.* (emphasis added); see also *ante,* at 65 (STEVENS, J., concurring) (referring to "the ceiling contained *in* (ii)" (emphasis added)). Yet the Court's holding necessarily assumes that the exception somehow stands outside of clause (ii)—someplace where its reference to "subparagraph" can have a different effect than "clause" would. The Court effectively requires the exception to be either part of clauses (i) and (ii) simultaneously, or a part of subparagraph (A) that is not within any of the individual clauses. The legislative drafting manuals cited by the Court, see *ante,* at 60–61, and n. 4, reveal how unnatural such an unanchored subdivision would be. See L. Filson, The Legislative Drafter's Desk Reference 223 (1992) ("If a section or other statutory unit contains subdivisions of any kind, it should never contain subdivisions of any other kind *unless they are parts of one of those subdivisions*" (emphasis added)); House Legislative Counsel's Manual on Drafting Style, HLC No. 104–1, p. 24 (1995) ("If there is a subdivision of the text of a unit, there should not be a different kind of subdivision of that unit *unless the latter is part of the 1st subdivision*" (emphasis added)); Senate Office of the Legislative Counsel, Legislative Drafting Manual 10–11 (1997) (explaining how to avoid "using a cut-in followed by flush language," that is, inserting a clause that is supposed to apply to (a)(1) and (a)(2) after (2) rather than between (a) and (a)(1)).

In its second step, the Court notes that, before 1995, the exception was generally read as applying to both clauses (i) and (ii). See *ante*, at 62. But the prior meaning is insufficient to reveal the meaning of the current version. As JUSTICE THOMAS points out, the placement of the exception "at the end of subdivision (A)" used to "indicat[e] that it was meant to refer to the whole of subdivision (A)." *Ante*, at 69. That inference, however, is no longer available, since Congress eliminated the "or" between clauses (i) and (ii) and added clause (iii). If the "or" were still there, it might just be possible to conceive of clauses (i) and (ii) as a sublist to which the exception attached as a whole. But one simply does not find a purportedly universal exception at the end of the second item in a three-item list.

The Court's third step addresses clause (iii), which is not directly implicated by the facts of this case. The Court concludes that the underlying measure of damages in clause (i) (twice the finance charge) "continues to apply" to actions governed by the newly created clause (iii). *Ante*, at 62. That conclusion does not follow from merely reading the exception in clause (ii) to apply to clause (i), but it is necessary because, by reading "subparagraph" in the exception to have the effect of extending the exception to all of subparagraph (A), the Court has caused *that* exception to conflict with the higher limit in clause (iii). To remedy this, the Court proceeds (see *ante*, at 62–63, n. 9) to do further violence to § 1640(a)(2)(A), simply reading out its division into clauses (i), (ii), and (iii) entirely.[1] It is not sound statutory construc-

---

[1] In footnote 9, the Court asserts that its new reading merely requires one to pretend that "Congress had not added '(iii)' when it raised the cap on recovery." That is not so—not, at least, if the Court adheres to the sound drafting principles that supposedly form the basis for its opinion. See *supra*, at 71. To adhere to *those* and also to apply both the limitation of clause (ii) and the limitation of clause (iii) to clause (i), one must "pretend" that Congress not only had not added "(iii)" but also had eliminated "(i)" and "(ii)." Otherwise, those limits which are recited in clause (ii) would apply only to that clause.

tion to create a conflict by ignoring one feature of a statute and then to solve the problem by ignoring yet another. My construction of the exception in clause (ii) avoids the conflict altogether.

In its fourth step, the Court returns to the application of the $100/$1,000 brackets to clause (i). The Court finds "scant indication that Congress meant to alter the meaning of clause (i)" in 1995 and compares this to "'Sir Arthur Conan Doyle's "dog that didn't bark."'" *Ante,* at 63 (quoting *Church of Scientology of Cal.* v. *IRS,* 484 U. S. 9, 17–18 (1987)). I hardly think it "scant indication" of intent to alter that Congress *amended the text of the statute* by moving the exception from the end of the list to the middle, making it impossible, without doing violence to the text, to read the exception as applying to the entire list. Needless to say, I also disagree with the Court's reliance on things that the sponsors and floor managers of the 1995 amendment *failed* to say.[2] I have often criticized the Court's use of legislative history because it lends itself to a kind of ventriloquism. The Congressional Record or committee reports are used to make words appear to come from Congress's mouth which were spoken or written by others (individual Members of Congress, congressional aides, or even enterprising lobbyists). The Canon of Canine Silence that the Court invokes today introduces a reverse—and at least equally dangerous—phenomenon, under which courts may refuse to believe .

---

[2] The things that *were* said about the 1995 amendment are characteristically unhelpful. Rep. McCollum said: "[T]he bill raises the statutory damages for individual actions from $1,000 to $2,000." 141 Cong. Rec. 26576 (1995); see also *id.,* at 26898 (remarks of Sen. Mack) (same). Two weeks later, he "clarif[ied]" his remarks by specifying that the amendments "apply solely to loans secured by real estate." *Id.,* at 27703 (statement of Reps. McCollum and Gonzalez). Taken literally, these floor statements could mean that the new $2,000 limit applies either to *all* "individual actions" under subparagraph (A), or to all "loans secured by real estate" under clauses (i) *and* (iii). Neither option is consistent with the Court's conclusion that there is a $1,000 limit under clause (i).

Congress's *own* words unless they can see the lips of others moving in unison. See *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 385, n. 2 (1992) ("[L]egislative history need not confirm the details of changes in the law effected by statutory language before we will interpret that language according to its natural meaning").

In its fifth and final step, the Court asserts that it would be "anomalous" for liability to be "uncapped by the [$1,000] limit" when real property secures an open-end loan but capped by the $2,000 limit when it secures a closed-end loan, and that it would be "passing strange" for damages to be *"substantially lower"* under clause (iii) than under clause (i). *Ante*, at 63, and n. 10. The lack of a $1,000 limit does not, of course, make liability under clause (i) limitless. In all cases under clause (i), the damages are twice the finance charge, and the 1-year statute of limitations, 15 U. S. C. § 1640(e), naturally limits the amount of damages that can be sought.

More importantly, Congress would have expected the amounts financed (and thus the finance charges) under clause (i) to be generally much lower than those under clause (iii). In cases (like this one) where loans are not secured by real property, the amount financed can be no greater than $25,000. § 1603(3). Where loans are secured by real property, clause (iii) includes both first mortgages and second mortgages (or home equity loans), which are far more common and significantly larger than the open-end home equity lines of credit (HELOCs) that are still covered by clause (i). In 1994, 64% of home-owning households had first or second mortgages, but only 7% had HELOCs with outstanding balances. Survey Research Center, Univ. of Michigan, National Survey of Home Equity Loans 25 (Oct. 1998) (Table 1) (hereinafter National Survey). The mean first mortgage balance was $66,884; the mean second mortgage balance was $16,199; and the mean HELOC outstanding balance was

$18,459. *Ibid.*[3]  Assuming a 10% interest rate (which would have been higher than a typical HELOC in 1994, see G. Canner & C. Luckett, Home Equity Lending: Evidence from Recent Surveys, 80 Fed. Res. Bull. 571, 582 (1994)), a year of finance charges on the mean HELOC would still have been less than $2,000—which, when doubled, would still be less than two times the maximum damages under clause (iii), a disproportion no greater than what Congress has explicitly prescribed between clauses (ii) and (iii).  In addition, very large outstanding balances on HELOCs are comparatively rare.  In 2001, roughly 94% of them were less than the *median* outstanding mortgage principal of $69,227.  See U. S. Census Bureau, American Housing Survey for the United States: 2001, pp. 150, 152 (Oct. 2002) (Table 3–15) (hereinafter American Housing Survey).[4]  Approximately 2% of HELOC balances were $100,000 or more (compared with approximately 32% of mortgages).  See *ibid.*  Because closed-end loans are many times more common, and typically much larger, than open-end ones, the finance charges would generally be much higher under clause (iii) than under clause (i), providing a reason for Congress to focus more intently on limiting damages in clause (iii).  As for the difference between clause (i) and the $1,000 cap in clause (ii): Consumer leases (principally car leases) are obviously a distinctive category and a special damages cap (which differs from clause (iii) as well as from clause (i)) no more demands an explana-

---

[3] The medians were, of course, lower than the means: $49,000 for first mortgages, $11,000 for second mortgages, and $15,000 for HELOCs.  National Survey 25 (Table 1).

[4] The 1994 survey did not report on the range of amounts owed on HELOCs.  In 2001, however, the Census Bureau's Housing Survey began reporting detailed data about HELOCs—in figures presumably comparable to the 1994 data recited above, since the median outstanding balance and median interest rate for HELOCs had not dramatically changed. (The 2001 medians were $17,517 and 8%.  See American Housing Survey 152, 154 (Table 3–15).)

tion than does the fact that damages for those leases are tied to monthly payments rather than to finance charges. As JUSTICE STEVENS acknowledges, applying the $1,000 cap to clause (ii) but not clause (i) is a "plausible policy decision." *Ante,* at 65. The Court should not fight the current structure of the statute merely to vindicate the suspicion that Congress actually made—but neglected to explain clearly— a different policy decision.

As the Court noted earlier this year: "If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred result." *Lamie* v. *United States Trustee,* 540 U.S. 526, 542 (2004) (internal quotation marks and alteration omitted). I would apply the exception only to the clause with which it is associated and affirm the judgment of the Court of Appeals.