# Requiring Identifying Information for Access to Financial Disclosure Reports During the Period Governed by Section 11(a) of the STOCK Act

A procedure under which prospective viewers are required to provide basic identifying information similar to that described in section 105(b)(2) of the Ethics in Government Act in order to access financial disclosure reports made available under section 11(a) of the Stop Trading on Congressional Knowledge Act is consistent with both these statutes.

This procedure may be implemented by Executive Branch agencies at the direction of the Office of Government Ethics, pursuant to its authority under section 402 of the Ethics in Government Act to prescribe procedures governing the public availability of financial disclosure reports.

The interim regime established by section 11(a) of the Stop Trading on Congressional Knowledge Act terminates upon implementation of the permanent public disclosure system on the Office of Government Ethics website required by section 11(b). Section 11(b)(2) makes clear that viewers may not be required to provide identifying information in order to view reports made available through that system.

August 22, 2012

MEMORANDUM OPINION FOR THE ACTING DIRECTOR
OFFICE OF GOVERNMENT ETHICS

The Stop Trading on Congressional Knowledge Act of 2012, Pub. L. No. 112-105, 126 Stat. 291, also known as the STOCK Act, requires the President to ensure that financial disclosure reports filed pursuant to title I of the Ethics in Government Act of 1978 ("EIGA") (codified as amended at 5 U.S.C. app. §§ 101–111 (2006 & Supp. IV 2010)), are made available to the public electronically. For an initial interim period, the President must ensure that the reports are made available through the official websites of Executive Branch agencies. *See* STOCK Act § 11(a), 126 Stat. at 298–99. This interim period begins on September 30, 2012, and ends no later than October 4, 2013. *See* Pub. L. No. 112-173, § 1, 126 Stat. 1310, 1310 (2012); STOCK Act § 11(b)(1), 126 Stat. at 299.[1] Thereafter, the

---

[1] The STOCK Act originally required that the first stage of Internet access begin on August 31, 2012. *Id*. § 11(a)(1), 126 Stat. at 298. The STOCK Act was subsequently amended to move this deadline to the end of September. Pub. L. No. 112-173, § 1, 126 Stat. at 1310. As noted below, section 11(b)(6) of the STOCK Act permits the Director

President must provide public access to the reports through a database on the website of the Office of Government Ethics ("OGE"). *See* STOCK Act § 11(b), 126 Stat. at 299. You have asked for our opinion whether, during the interim period when reports are made available on agency websites under section 11(a), prospective viewers may be required to provide basic identifying information similar to the information described in section 105(b)(2) of the EIGA, 5 U.S.C. app. § 105(b)(2), in order to access the reports. *See* Letter for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from Don W. Fox, Acting Director, OGE, at 1 (July 13, 2012) ("Request Letter"). We conclude that such a procedure would be consistent with the STOCK Act and the EIGA and could be implemented by Executive Branch agencies at the direction of OGE, pursuant to its authority under section 402 of the EIGA, 5 U.S.C. app. § 402 (2006), to prescribe procedures governing the public availability of financial disclosure reports. We note, however, that the interim regime established by section 11(a) of the STOCK Act terminates upon implementation of the permanent public disclosure system on the OGE website required by section 11(b). STOCK Act § 11(a)(4), 126 Stat. at 299. As we explain below, section 11(b)(2) of the STOCK Act makes clear that viewers may *not* be required to provide identifying information in order to view reports made available through that system.

## I.

Section 101 of the EIGA requires certain officers and employees in the Executive Branch to file financial disclosure reports containing detailed information about their income, assets, liabilities, and financial transactions. *See* 5 U.S.C. app. §§ 101–102. Section 105(a) of the EIGA requires that each executive agency and supervising ethics office "make available to the public" those reports, in accordance with section 105(b). *Id.* § 105(a). Section 105(b)(1) provides that any person seeking to inspect or copy a report must be permitted to do so. *Id.* § 105(b)(1). Section 105(b)(2), however, provides that a report

---

of the Office of Government Ethics to extend the October 4, 2013 deadline for commencing the second stage of Internet access.

may not be made available under this section to any person nor may any copy thereof be provided under this section to any person except upon a written application by such person stating—

    (A) that person's name, occupation and address;

    (B) the name and address of any other person or organization on whose behalf the inspection or copy is requested; and

    (C) that such person is aware of the prohibitions on the obtaining or use of the report.

*Id.* § 105(b)(2). Section 105(c)(1) of the EIGA sets forth the prohibitions on obtaining or using reports:

It shall be unlawful for any person to obtain or use a report—

    (A) for any unlawful purpose;

    (B) for any commercial purpose, other than by news and communications media for dissemination to the general public;

    (C) for determining or establishing the credit rating of any individual; or

    (D) for use, directly or indirectly, in the solicitation of money for any political, charitable, or other purpose.

*Id.* § 105(c)(1).

The EIGA assigns the Director of OGE various responsibilities in connection with the financial disclosure reports and with preventing conflicts of interest on the part of officers and employees of the Executive Branch. Of particular relevance to your inquiry, the EIGA provides that "[t]he responsibilities of the Director shall include—(1) developing . . . rules and regulations establishing procedures for the . . . public availability of financial statements filed by officers and employees in the executive branch" pursuant to the EIGA. *Id.* § 402(b).[2] The EIGA further provides that the

---

[2] Section 402(b)(1), which was enacted as part of the original EIGA in 1978, states that the disclosure statements are "required by title II of [the EIGA]." *Id.* The EIGA was substantially amended by the Ethics Reform Act of 1989, however; and, in that process, title II was repealed, and the provisions governing the filing of disclosure reports by Executive Branch officers and employees were moved to title I. *See* Ethics Reform Act of 1989 ("1989 Act"), Pub. L. No. 101-194, tit. II, §§ 201–202, 103 Stat. 1716, 1724–44. We have found nothing in either the text of the 1989 Act or its legislative history suggesting that this revision was intended to affect the Director's authority under section

"Director shall . . . ensure that each executive agency has established written procedures relating to how the agency is to . . . , if applicable, make publicly available, financial disclosure statements filed by any of its officers or employees," *id.* § 402(d)(1), and "shall ensure that each agency's procedures are in conformance with all applicable requirements, whether established by law, rule, regulation, or Executive order," *id.* § 402(d)(2).

The STOCK Act imposes enhanced requirements regarding the public availability of financial disclosure reports. Specifically, it establishes a two-stage process for making reports available to the public through the Internet. The first stage is described in section 11(a) of the Act. That provision requires that, not later than September 30, 2012, "the President shall ensure" that financial disclosure reports filed by Executive Branch employees pursuant to title I of the EIGA "are made available to the public on the official websites of the respective executive branch agencies not later than 30 days after such forms are filed." STOCK Act § 11(a)(1), 126 Stat. at 298; Pub. L. No. 112-173, § 1, 126 Stat. at 1310. The interim requirements of section 11(a)(1) terminate upon the implementation of the second stage, a "public disclosure system established under subsection (b)" of section 11. STOCK Act § 11(a)(4), 126 Stat. at 299.

Paragraph (1) of section 11(b) describes the general contours of that public disclosure system. It requires that, not later than October 4, 2013 (eighteen months after enactment of the STOCK Act), unless that deadline is extended pursuant to section 11(b)(6), "the President, acting through the Director of [OGE], shall develop systems to enable" (A) "electronic filing" of the financial disclosure reports required by the EIGA and (B)

---

402(b)(1) to prescribe rules and regulations governing the public availability of financial disclosure reports filed by Executive Branch officers and employees. On the contrary, section 111 of the EIGA, as added by the 1989 Act, expressly assigns the Director responsibility for administering the provisions of the newly enacted title I with regard to those officials. 5 U.S.C. app. § 111(1). We therefore conclude that the 1989 Act did not impair the Director's rulemaking authority under section 402(b)(1). *See Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009) ("'repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal [is] clear and manifest'" (brackets in original)). Accordingly, section 402(b)(1)'s reference to "title II" of the EIGA should be understood as a reference to the provisions governing disclosure reports by Executive Branch officials currently located in title I.

"public access" to reports filed by Executive Branch officials "through databases that—(i) are maintained on the official website of [OGE]; and (ii) allow the public to search, sort, and download data contained in the reports." *Id.* § 11(b)(1), 126 Stat. at 299.

Paragraph (2) of subsection (b) addresses the information that may be required from individuals seeking access to financial disclosure reports under section 11. It states:

> No login shall be required to search or sort the data contained in the reports made available by this subsection. A login protocol with the name of the user shall be utilized by a person downloading data contained in the reports. For purposes of filings under this section, section 105(b)(2) of the Ethics in Government Act of 1978 (5 U.S.C. App. 105(b)(2)) does not apply.

*Id.* § 11(b)(2), 126 Stat. at 299.

## II.

In our view, during the interim period governed by section 11(a) of the STOCK Act, Executive Branch agencies may implement that section's electronic disclosure requirement through a procedure that requires individuals to provide information similar to that specified in section 105(b)(2) of the EIGA before accessing a financial disclosure report via an agency website. OGE may prescribe that procedure under section 402 of the EIGA, which authorizes it to establish rules governing the public availability of financial disclosure reports.

## A.

As noted, your letter requests our opinion about the implementation of section 11(a) of the STOCK Act. In the letter, you first raise the possibility that section 105(b)(2) of the EIGA—which requires a requester to supply certain identifying information in order to obtain access to a report—continues to apply when reports are made available on agency websites pursuant to section 11(a). *See* Request Letter at 2 n.1. If section 105(b)(2) applied in that circumstance, then the answer to your inquiry would be straightforward: A procedure requiring an individual seeking access to a report via a website to first provide the identifying infor-

mation specified in section 105(b)(2) would clearly be permissible; indeed, that procedure would be statutorily mandated. *See* 5 U.S.C. app. § 105(b)(2) (stating that a report "may not be made available . . . except upon a written application" including the specified information). We do not, however, believe that to be the natural reading of the statutory scheme.

Instead, we believe that under the best reading of the pertinent provisions, EIGA section 105(b)(2) does not apply when reports are made available on agency websites pursuant to section 11(a) of the STOCK Act. To be sure, the STOCK Act does not repeal section 105(b)(2). The preconditions to disclosure set forth in section 105(b)(2) therefore continue to apply when individuals seek to inspect or obtain copies of reports through non-electronic means (such as in person or by mail). But section 105(b)(2) applies only when a report or copy thereof is "made available under this section," *id.*, i.e., under section 105 of the EIGA. And a report that is made available via the Internet pursuant to section 11(a) of the STOCK Act has not been "made available under" section 105 of the EIGA, as that phrase is naturally understood. Thus, section 105(b)(2), by its own terms, is inapplicable to reports made available under section 11(a) of the STOCK Act.

In any event, even assuming that section 105(b)(2) would otherwise apply to reports made available under section 11(a) of the STOCK Act, section 11(b)(2) of the STOCK Act states that, "[f]or purposes of filings *under this section*, section 105(b)(2) of the Ethics in Government Act of 1978 (5 U.S.C. App. 105(b)(2)) does not apply." 126 Stat. at 299 (emphasis added). That provision renders the conditions on disclosure in section 105(b)(2) inapplicable to reports governed by section 11 of the STOCK Act, including reports made available pursuant to section 11(a).

In context, the phrase "[f]or purposes of filings under this section" is best read to mean "for purposes of reports governed by this section." The term "filings" appears to refer to financial disclosure reports, which the STOCK Act uses varying terminology to describe. *Compare, e.g.,* STOCK Act § 11(a)(1), 126 Stat. at 298 (referring to the disclosure reports as "forms"), *with id.* § 11(b)(1), 126 Stat. at 299 (referring to them as "reports"). Section 105(b)(2) addresses public access to reports after they have been filed with the relevant agencies, at which point the reports are appropriately called "filings." *See Black's Law Dictionary*

705 (9th ed. 2009) (defining "filing" as "[a] particular document . . . in the file of a . . . record custodian"). The term "under," when used in a statute, frequently means "governed by" or "subject to the requirements of." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008); *The American Heritage Dictionary of the English Language* 1874 (4th ed. 2006) ("*American Heritage Dictionary*") (definitions 7–10 of "under"); *Webster's Third New International Dictionary of the English Language* 2487 (1993) ("*Webster's Dictionary*") (definitions 8b, 9b, and 10a of "under").

The term "section" is best understood as referring to section 11 of the STOCK Act in its entirety, including section 11(a). Congress ordinarily adheres to a hierarchical scheme when subdividing statutory sections and referencing those sections and their subdivisions. *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). Thus, Congress generally uses the term "section" to refer to a statutory section as whole and the term "subsection" to refer to one of the section's first-level subdivisions, which are typically preceded by lowercase letters, such as "(a)" or "(b)." *See id.* at 60–61. Congress appears to have followed that practice in the STOCK Act, including in section 11. *See, e.g.*, STOCK Act § 6(b), 126 Stat. at 294 (referring to "subsection (a)"); *id.* § 11(a)(4), 126 Stat. at 299 (distinguishing between "this subsection" and "subsection (b)"); *id.* § 14, 126 Stat. at 300–01 (referring to "section 6 of this Act"). The Supreme Court has, on rare occasions, concluded that a statutory reference to "section" or "subsection" was a drafting error and should be disregarded. *See, e.g.*, *Dir., Workers' Comp. Programs v. Rasmussen*, 440 U.S. 29, 41 (1979) (concluding that use of the term "subsection" was "plainly in error" where the provision referred to "[d]eterminations under this subsection" and no determinations were made under the subsection). We see no indication, however, that Congress made a drafting error here. On the contrary, as we have noted, in drafting the STOCK Act, Congress appears to have observed the distinction between the terms "section" and "subsection" throughout. We therefore believe that section 11(b)(2) of the STOCK Act makes clear that section 105(b)(2) of the EIGA does not apply for purposes of disclosure reports governed by section 11 of the STOCK Act. Accordingly, the EIGA's requirement that a requester seeking financial disclosure reports supply specified identifying information is inapplicable when reports are made available pursuant to section 11(a).

In your Request Letter, you identify a potential alternative reading of the statement in section 11(b)(2) that "[f]or purposes of *filings under this section*, section 105(b)(2) of the Ethics in Government Act of 1978 (5 U.S.C. App. 105(b)(2)) does not apply." 126 Stat. at 299 (emphasis added). *See* Request Letter at 2 n.1. Under that reading, this statement declares that section 105(b)'s preconditions for disclosure are inapplicable only for reports actually filed pursuant to requirements imposed by section 11. *Id.* You note that, while section 11(b) requires the filing of reports, because it imposes a new electronic filing requirement, STOCK Act § 11(b)(1)(A), 126 Stat. at 299, section 11(a) primarily addresses public access to reports *that have already been filed*. Request Letter at 2 n.1. You therefore suggest that section 105(b)(2)'s requirements would, as a practical matter, be inapplicable when an individual seeks access to reports filed under section 11(b), but that the requirements would continue to apply when an individual seeks access to reports under section 11(a). *Id.* In our view, however, this alternative reading of section 11(b)(2) has significant weaknesses.

For the alternative reading to be correct, "filings" would have to refer to "submissions" of financial disclosure reports, rather than to the reports themselves, and "under" would have to mean "as required by," rather than "governed by." Those are plausible meanings of "filings" and "under." *See* STOCK Act § 11(b)(1)(A), 126 Stat. at 299 (referring to "electronic filing of reports"); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1331 (2011) (noting that "file" can mean "to place among official records as prescribed by law"); *Kucana v. Holder*, 558 U.S. 233, 244 (2010) (noting that "under" can mean "pursuant to" or "by reason of the authority of"); *Webster's Dictionary* at 849 (definition 3a(1) of "file") ("to deliver (as a legal paper or instrument) after complying with any condition precedent (as the payment of a fee) to the proper officer for keeping on file among the records of his office"); *id.* at 2487 (definition 8a of "under") ("required by"). But taken in context, those meanings do not seem as likely as the meanings that we have ascribed to the terms.

Moreover, the alternative reading has two serious flaws: First, it provides no explanation for Congress's use of the word "section," as opposed to the word "subsection," in section 11(b)(2). Under the alternative read-

ing, the provision would have the same meaning regardless of which word Congress used. Therefore, if Congress had intended the alternative reading, Congress presumably would have used the word "subsection," the word it used earlier in section 11(b)(2); but Congress did not do so.

In addition, the alternative reading rests on the mistaken premise that section 11(b) is the only provision in section 11 that requires "filings." Contrary to that premise, one provision in section 11(a) also requires filings: Section 11(a)(3) states that "transaction disclosure[s] required by section 103(l) of the [EIGA] . . . *shall be filed* not later than the date required by that section." STOCK Act § 11(a)(3), 126 Stat. at 299 (emphasis added). Thus, the practical effect of the alternative reading would be that section 105(b)(2)'s preconditions on disclosure would be inapplicable both when an individual seeks reports under section 11(b) *and* when an individual seeks *transaction* reports under section 11(a). The preconditions would continue to apply when an individual seeks access to *other* disclosure reports under section 11(a). We have found no basis for this counter-intuitive reading in the legislative history and cannot conceive of any reason why Congress would have adopted such a patchwork scheme of conditions on disclosure.

For these reasons, we conclude that, pursuant to section 11(b)(2) of the STOCK Act, the requirements for disclosure in section 105(b)(2) do not apply during the interim period when reports are made available on agency websites under section 11(a).

## B.

Because section 105(b)(2) does not apply, agencies have no statutory obligation to condition a requester's access to reports made available under section 11(a) on the requester's provision of the information specified in section 105(b)(2). Nonetheless, the fact that agencies are not *obligated* to impose that condition does not mean that agencies are *prohibited* from imposing the condition through the exercise of discretion if they otherwise have the authority to do so. And, in our view, agencies have the authority, subject to the direction of OGE, to require that individuals seeking access to financial disclosure reports during the period governed by section 11(a) of the STOCK Act provide basic identifying information like the items specified in section 105(b)(2).

As an initial matter, we believe that section 11(a) of the STOCK Act, in conjunction with section 402 of the EIGA, authorizes the agencies that receive financial disclosure reports from their officers and employees to establish, under the direction of OGE, appropriate procedures governing how the reports are made available on agency websites. Section 11(a) imposes on the President the obligation to "ensure" that the reports are "made available to the public on the official websites of the respective executive branch agencies." STOCK Act § 11(a)(1), 126 Stat. at 298. The President could not fulfill that obligation unless the Executive Branch had authority to develop and implement appropriate procedures to make the reports available. Section 11(a) thus necessarily implies that the Executive Branch has that authority.

The STOCK Act does not assign the authority to establish procedures for complying with section 11(a) to any specific component of the Executive Branch. The nature of the obligation, however, together with EIGA section 402, makes clear that the authority lies with the various Executive Branch agencies that receive the reports, subject to the direction of OGE. Because the reports must be made available on the websites of the "respective executive branch agencies," those agencies are logical repositories of the authority to establish procedures governing how the reports are made available. Moreover, the EIGA confirms that each agency generally has the authority to establish "procedures relating to how the agency is to . . . make publicly available[] financial disclosure statements filed by any of its officers or employees." 5 U.S.C. app. § 402(d)(1). The EIGA makes clear, however, that OGE also has authority to "establish[] procedures" governing the "public availability" of financial disclosure reports, *id.* § 402(b)(1), and that OGE may use that authority to superintend the procedures established by the agencies and ensure their "conformance with all applicable requirements," including requirements prescribed by OGE, *id.* § 402(d)(2).

The procedures governing how reports are made available on agency websites may incorporate reasonable prerequisites to or limitations on access, provided that those prerequisites are consistent with section 11(a)'s command that the reports be "made available," as well as with any other applicable legal requirements. *See generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–45 (1984) (explaining that, when an agency has been delegated authority to fill a gap in a statute,

the agency's action is controlling if Congress has not addressed the point at issue and the agency's action is reasonable); *e.g.*, *United States ex rel. Touhy v. Regan*, 340 U.S. 462, 468 (1951) (holding that a statute authorizing the Attorney General to prescribe regulations for "the custody, use, and preservation of the records, papers, and property" of the Department of Justice, 5 U.S.C. § 22 (1946), empowered the Attorney General to promulgate a regulation that reserved to himself the decision whether to release documents in response to a subpoena).

## C.

### 1.

In our view, requiring prospective viewers to provide basic information, similar to the information listed in EIGA section 105(b)(2), before accessing reports is a reasonable limitation consistent with section 11(a)'s general command that the reports be "made available to the public" on agency websites. STOCK Act § 11(a)(1), 126 Stat. at 298. "Available" means "accessible" or "obtainable." *See American Heritage Dictionary* at 123 (definitions 1 and 2); *Webster's Dictionary* at 150 (definition 4). Thus, reports are made "available" if prospective viewers may access or obtain the reports upon presentation of basic identifying information.

Significantly, section 105 of the EIGA supports the conclusion that requiring prospective viewers to provide information like that specified in section 105(b)(2) before they may access reports is consistent with section 11(a)'s command that reports be "made available to the public." Section 105's public availability requirement is phrased in virtually identical language, *see* 5 U.S.C. app. § 105(a) (stating that each agency shall "make available to the public" each report filed with the agency); yet section 105(b)(2) requires an individual to provide the specified information as a precondition to inspecting or copying a report. *See id.* § 105(b)(2). Thus, section 105 demonstrates that Congress considered a requirement that prospective viewers provide such information before accessing reports to be consistent with a command that reports be "made available to the public."

Moreover, when Congress enacts a new statute using language that has a settled meaning, the new statute is generally construed to embody that

settled meaning. *See Evans v. United States*, 504 U.S. 255, 260 n.3 (1992) ("[A]s Justice Frankfurter advised, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947))). Because section 11(a) incorporates language that was understood to be consistent with a requirement that prospective viewers provide basic identifying information before accessing reports, section 11(a) also should be construed as consistent with that requirement.

Other statutory provisions confirm that if Congress had intended to preclude OGE and other agencies from requiring prospective viewers to provide basic identifying information before accessing reports made available under section 11(a), Congress would have done so explicitly. For example, section 11(b)(2) of the STOCK Act states that "[n]o login shall be required to search or sort the data contained in the reports made available by this subsection." 126 Stat. at 299. As we explain in more detail below, that provision does not address whether identifying information may be required to access reports made available under section 11(a), because the provision applies only to reports made available under section 11(b). *See infra* pp. 214–216. The provision strongly suggests, however, that a requirement that prospective viewers provide identifying information is permissible in this context absent an express statement to the contrary. Otherwise there would have been no need for Congress to add the provision in order to preclude OGE and other agencies from requiring a login to search or sort reports made available under section 11(b). *See Corley v. United States*, 556 U.S. 303, 314 (2009) (statutes should be construed to avoid rendering any of their provisions superfluous).

In other statutes as well, where Congress has intended to prohibit a requirement that users provide identifying information before availing themselves of a feature on agency websites, Congress has made that prohibition explicit. Thus, the Inspector General Reform Act of 2008, which requires the website of the Office of the Inspector General of each agency to include a link that allows individuals to report fraud, waste, or abuse, expressly provides that individuals using the links "shall not be required to provide personally identifying information." Pub. L. No. 110-409, sec. 13(a), § 8L(b)(2)(A), 122 Stat. 4302, 4316.

Finally, a procedure under which prospective viewers must provide basic identifying information and acknowledge the legal prohibitions on obtaining and using reports is a reasonable way to achieve the purposes of section 11(a) of the STOCK Act, consistent with the limitations on public access to financial disclosure reports imposed by the EIGA. Although section 11(a) of the STOCK Act aims to enhance public access to financial disclosure reports by making those reports accessible via the Internet, *see, e.g.*, 158 Cong. Rec. S195 (daily ed. Jan. 31, 2012) (statement of Sen. Begich); *id.* at S196 (statement of Sen. Lieberman); *id.* at S1979 (daily ed. Mar. 22, 2012) (statement of Sen. Lieberman), section 11(a) and the rest of the STOCK Act leave in place the restrictions on obtaining and using reports imposed by EIGA section 105(c)(1). Conditioning access to reports via agency websites on the provision of basic information, including an acknowledgement of those restrictions, would facilitate enforcement of the restrictions without impairing section 11(a)'s goal of making reports available via the Internet during the interim period before implementation of the permanent disclosure system required by section 11(b).[3]

For these reasons, we believe that a procedure requiring prospective viewers to provide basic identifying information, such as the items listed in EIGA section 105(b)(2), before accessing disclosure reports via agency websites would be a reasonable means of implementing section 11(a) of the STOCK Act.

## 2.

An argument can be constructed, based on the legislative history of the EIGA, that such a procedure is not a permissible method for implementing section 11(a). In our view, however, that argument is not persuasive.

---

[3] As we explain in Part II.D, Congress imposed limitations on the collection of identifying information from prospective users during the second stage of Internet access, once a permanent database (with search, sort, and download capability) is established on the OGE website. Nonetheless, requiring identifying information during the first stage (before establishment of the permanent OGE database) would facilitate a smooth transition to the second stage by providing enhanced protections against potential misuse of the reports while the President determines whether to exempt from the disclosure requirements certain filers who may be particularly vulnerable to misuse of their reports. *See infra* pp. 214–216.

The versions of the EIGA originally passed by the Senate and considered on the floor of the House of Representatives contained provisions, similar to current section 105(b)(2), that required prospective viewers to provide basic identifying information before accessing reports. *See* S. 555, 95th Cong. § 305(c) (as passed by Senate, June 27, 1977); 124 Cong. Rec. 30,434, 30,436 (1978) (H.R. 13850, 95th Cong. § 104(c) (1978)) (considered as substitute to H.R. 1, 95th Cong. (1978)) (requirement with respect to reports by congressional officials); 124 Cong. Rec. at 30,468 (H.R. 13850, 95th Cong. § 205(b)(1)) (requirement with respect to reports by executive officials); 124 Cong. Rec. at 32,028 (H.R. 13850, 95th Cong. § 305(b)(1)) (requirement with respect to reports by judicial officials). Those provisions were, however, removed before final passage of the EIGA. *See* 124 Cong. Rec. at 30,447 (amendment, offered by Rep. Frenzel, striking the requirement with respect to reports by congressional officials); H.R. Rep. No. 95-1756, at 24–25, 37–38 (1978) (Conf. Rep.) (Conference Committee agreement removing the requirements with respect to reports by Executive Branch and judicial employees); Ethics in Government Act of 1978, Pub. L. 95-521, §§ 104, 205, 305, 92 Stat. 1824, 1832–33, 1846–47, 1859 (legislation as enacted). In offering the amendment to strike the requirement with respect to reports by congressional officials, Representative Frenzel stated that the amendment revised the section governing public availability of reports "so that a person requesting" access to a report "may not or need not be required to leave his name and organization." 124 Cong. Rec. at 30,447.

The following year, the Director of OGE testified before a congressional subcommittee that, based on this drafting history, OGE did not believe that it had authority to require an individual to provide his name as a condition of receiving a report. *See Financial Disclosure Provisions of the Ethics in Gov't Act of 1978: Hearing on H.R. 2805 Before the Subcomm. on Human Res. of the H. Comm. on the Post Office & Civil Serv.*, 96th Cong. 9–10 (1979). Congress subsequently amended the EIGA to add requirements that prospective viewers provide basic identifying information before accessing reports, *see* Act of June 13, 1979, Pub. L. No. 96-19, § 8, 93 Stat. 37, 41–42, and those requirements were consolidated in section 105(b)(2) as part of the EIGA's reorganization in 1989, *see supra* note 2; 1989 Act, sec. 202, § 105, 103 Stat. at 1738.

Based on this history, it could be argued that (1) the EIGA, as originally enacted (without section 105(b)(2)), did not permit OGE and other agencies to require prospective viewers of reports to provide identifying information; (2) section 11(b)(2) of the STOCK Act, by declaring that section 105(b)(2) does not apply to reports made available under section 11(a), effectively restores the EIGA as originally enacted for reports made available under section 11(a); and (3) OGE and other agencies therefore do not have authority to condition access to reports under section 11(a) on the requester's providing basic identifying information. We believe, however, that this argument has several fatal defects.

First, it is not accurate to view section 11(b)(2) as effectively restoring the EIGA as originally enacted. As we explained above, section 11(b)(2) does not repeal section 105(b)(2). Section 105(b)(2) remains a part of the EIGA and continues to apply at least when reports are accessed through means other than the Internet access mandated by section 11. *See supra* p. 203. And, as described above, section 105(b)(2) supports the conclusion that OGE and other agencies may require prospective viewers of reports under section 11(a) to provide identifying information. *See supra* p. 208. In addition, section 11(b)(2) contains other provisions besides the declaration that section 105(b)(2) does not apply to reports made available under section 11(a). As explained above, one of those other provisions, the login prohibition for searching and sorting reports made available under section 11(b), also supports the permissibility of a requirement that prospective viewers provide identifying information before viewing reports under section 11(a). *See supra* p. 209.

Second, we do not believe that the legislative history establishes that the EIGA as originally enacted prohibited OGE and other agencies from conditioning access to Executive Branch financial disclosure reports on the requester's providing basic identifying information. The provisions that were removed from the EIGA during the legislative process would have *required* agencies to impose that condition. Congress's decision not to require agencies to impose the condition does not establish that Congress also intended to prohibit OGE and other agencies from imposing the condition as an exercise of their discretion to establish procedures implementing the public availability requirement. The floor statement by Representative Frenzel suggests that he may have believed that the deletion of the requirement meant that the condition could not be imposed. But floor

statements, even by amendment sponsors, are of limited utility in interpreting legislative provisions. *See Consumer Prods. Safety Comm'n v. GTE Sylvania, Inc*., 447 U.S. 102, 118 (1980) ("[O]rdinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history."); *Zuber v. Allen*, 396 U.S. 168, 186 (1969) ("Floor debates reflect at best the understanding of individual Congressmen."). Moreover, Representative Frenzel's statement concerned only the deletion of the requirement with respect to reports filed by congressional officials. The requirement that access to Executive Branch reports be conditioned on the requester's providing identifying information was retained in the bill passed by the House, *see* 124 Cong. Rec. at 32,024, 32,028 (S. 555, 95th Cong. § 205(b)(1) (Sept. 27, 1978)), and was deleted in the House-Senate Conference. The Conference Report does not discuss the deletion and gives no indication that the conferees understood the deletion to preclude OGE and other agencies from deciding, in their discretion, to condition access to Executive Branch reports on the provision of identifying information. *See* H.R. Rep. No. 95-1756.

As noted above, the Director of OGE later testified that he interpreted this legislative history to preclude any requirement that prospective viewers provide identifying information, and Congress in 1979 subsequently added that requirement to the EIGA. Those events, however, constitute, at most, subsequent legislative history about the meaning of the EIGA as originally enacted, and "'subsequent legislative history is a "hazardous basis for inferring the intent of an earlier" Congress.'" *Jones v. United States*, 526 U.S. 227, 238 (1999) (quoting *Pension Benefit Guar. Corp. v. LTV Corp*., 496 U.S. 633, 650 (1990) (quoting, in turn, *United States v. Price*, 361 U.S. 304, 313 (1960))). Moreover, the 1979 enactment establishes only that Congress wanted to require that prospective viewers provide identifying information; the 1979 enactment does not indicate whether Congress believed that agencies could have imposed the requirement on their own volition.

Finally, the argument based on this legislative history turns on Congress's decision not to include a particular provision in the EIGA as originally enacted. The argument is not anchored in the statutory text that was in fact enacted. And "courts have no authority to enforce [a] princip[e] gleaned solely from legislative history that has no statutory reference point." *Shannon v. United States*, 512 U.S. 573, 584 (1994) (quota-

tion omitted, brackets in original). This aspect of the legislative history of the EIGA thus does not alter our conclusion that conditioning access to disclosure reports on the requester's providing basic identifying information, similar to the information listed in EIGA section 105(b)(2), would be a reasonable means of implementing section 11(a) of the STOCK Act.

## D.

Even though that procedure would be a reasonable means of implementing section 11(a) of the STOCK Act, the procedure would not be permissible if some other provision of the STOCK Act or the EIGA prohibited it. The only provision of either statute that could be construed to contain such a prohibition, however, is the first sentence in section 11(b)(2) of the STOCK Act, and the text of that provision is best read not to contain such a prohibition.

As discussed above, the provision states that "[n]o login shall be required to search or sort the data contained in the reports made available by this *subsection*." STOCK Act § 11(b)(2), 126 Stat. at 299 (emphasis added). The prohibition on requiring a "login" to "search or sort" the data in the reports is, in our view, tantamount to a prohibition on requiring prospective viewers to provide identifying information before viewing the reports. The ordinary meaning of "login" is "[t]he process of identifying oneself to a computer, usually by entering one's username and password." *American Heritage Dictionary* at 1029; *accord Random House Dictionary of the English Language* 1130 (2d ed. 1987) (definition 17a of "log"). A prohibition on requiring a prospective user to provide identifying information before "search[ing] or sort[ing]" data necessarily includes a prohibition on requiring a prospective user to provide such information before taking the lesser step of viewing the data.

Nonetheless, we believe that the login prohibition applies only when prospective viewers seek access to a financial disclosure report under the second stage of the process mandated by section 11—the permanent public disclosure system required by subsection (b). The login prohibition does not apply when prospective viewers seek access to reports during the first stage, when reports are accessible via websites pursuant to subsection (a). The login prohibition, by its plain terms, applies only to reports

"made available by this subsection." STOCK Act § 11(b)(2), 126 Stat. at 299. The phrase "this subsection" refers to subsection (b) of section 11, not section 11 as a whole. As explained above, Congress generally uses the term "subsection" to refer to a first-level subdivision of a statutory section, rather than the section as a whole, and Congress generally adhered to that practice in the STOCK Act, including in section 11. *See supra* p. 204.

Although, as noted above, Congress may sometimes make drafting errors and use the term "subsection" when it actually means "section," again we do not believe that Congress erred here. On the contrary, as set forth above, Congress carefully adhered to the distinction between the terms "section" and "subsection" throughout the STOCK Act. *See supra* p. 204. Moreover, Congress could reasonably have concluded that OGE and other agencies should have discretion to require that prospective users provide identifying information in order to access financial disclosure reports during the eighteen-month period before establishment of the permanent database required by subsection (b). As members of Congress recognized, broader public access to financial disclosure reports increases the risk that the officers and employees who file those reports may be subject to misuse of their personal information for unlawful or other nefarious purposes. *See, e.g.*, 158 Cong. Rec. S1979 (daily ed. Mar. 22, 2012) (statement of Sen. Levin). Requiring prospective viewers to supply identifying information and to acknowledge the restrictions on using reports provides some deterrent against misuse of the information in the reports. Allowing OGE and other agencies to maintain that deterrent during the eighteen-month period before establishment of the permanent database serves a valuable purpose: During that time, the President could evaluate whether some categories of officers and employees may be particularly vulnerable to misuse of their information, *see id.* (statement of Sen. Levin) (suggesting that law enforcement, military, and intelligence officers may be particularly vulnerable), and, if necessary, invoke statutory provisions that allow him to exempt from public disclosure reports filed by certain officers and employees, *see, e.g.*, 5 U.S.C. app. § 105(a)(1) (allowing the President to exempt from public disclosure reports filed by individuals engaged in intelligence activities); 158 Cong. Rec. S1980 (daily ed. Mar. 22, 2012) (colloquy between Senators Reid and Lieberman stating that this exemption authority applies to section 11 of the STOCK Act).

For these reasons, we conclude that the login prohibition in the first sentence of section 11(b)(2) does not prohibit OGE and other agencies from requiring that prospective viewers provide basic identifying information before they may access financial disclosure reports made available during the interim period governed by subsection (a).

## III.

In sum, a procedure under which prospective viewers are required to provide information similar to that described in section 105(b)(2) of the EIGA in order to access financial disclosure reports made available under section 11(a) of the STOCK Act is consistent with both the STOCK Act and the EIGA. In our judgment, this procedure may be implemented by Executive Branch agencies at the direction of OGE pursuant to its authority under section 402 of the EIGA to prescribe procedures governing the public availability of financial disclosure reports.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*