# Third District Court of Appeal

## State of Florida

Opinion filed November 5, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-2257
Lower Tribunal No. 08-24725
_____


**Katline Realty Corp., a Florida Corporation,**
Appellant,

vs.

**Gregg Avedon, as Personal Representative of the Estate of Jane Avedon.**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Jacqueline Hogan Scola, Judge.

David H. Charlip, for appellant.

Mark A. Marder, for appellee.


Before WELLS, SUAREZ and SALTER, JJ.

WELLS, Judge.

Lender, Katline Realty Corporation, appeals from a final judgment in favor of borrowers, Arnold and Jane Avedon. The Avedons are now deceased and Gregg Avedon, as personal representative for the estate of Jane Avedon, has been substituted as the appellee in this appeal. We affirm that portion of the judgment finding that Katline violated the Homeownership and Equity Protection Act of 1994 (HOEPA)[1], but reverse for recalculation of the amount of set-off to which the estate is entitled against the remaining amounts owed to Katline.

In April 2000, the Avedons, an elderly couple living on social security benefits, executed a $37,000 promissory note secured by a mortgage on their home in Katline's favor. The evidence below confirmed that this high interest loan is a mortgage loan transaction which falls within the purview of HOEPA. See 15

---

[1] HOEPA was enacted in 1994 as an amendment to The Truth In Lending Act (TILA) to address predatory lending practices targeted at a special class of regulated closed-end home equity loans. See Eugene J. Kelly, Jr. et al., An Overview of HOEPA, Old and New, Consumer Finance Law Quarterly Report, (Fall 2005); 15 U.S.C. § 1639. TILA itself was enacted in 1968 and generally "promotes consumers' informed use of credit by requiring meaningful disclosure of credit terms relating to finance charges, interest rates, and borrowers' rights, and protects consumers against inaccurate and unfair credit billing and credit card practices[, and] subjects the creditor to civil damages, penalties, rescission and recoupment, and criminal liability [for violations]." Validity, Construction, and Application of Truth in Lending Act (TILA) and Regulations Promulgated Thereunder—United States Supreme Court Cases, 67 A.L.R. Fed 2d 567 (2012); 15 U.S.C. § 1601 et seq.

Because the parties agree that the 2000 version of the federal statutes apply to this case, this opinion will cite to and quote from that version of both TILA and HOEPA.

U.S.C. § 1602(aa) (2000)[2]; see also Eugene J. Kelly, Jr. et al., An Overview of HOEPA, Old and New, Consumer Finance Law Quarterly Report, Fall 2005 (confirming generally that to come within HOEPA a loan must be a non-purchase money loan secured by the borrower's principal dwelling, and call for either a high annual percentage interest rate or excessive points and fees).

The evidence adduced below also confirmed that this mortgage loan transaction violated HOEPA because it provided for an increase in the loan's interest rate on default and because it imposed a prepayment penalty. See 15 U.S.C. § 1639(d) (2000) (providing that mortgage loans subject to HOEPA "may not provide for an interest rate applicable after default that is higher than the interest rate that applies before default"); 15 U.S.C. § 1639(c) (2000) (providing that mortgage loans subject to HOEPA "may not contain terms under which a consumer must pay a prepayment penalty for paying all or part of the principal before the date on which the principal is due").

Thus, in late 2005 when the Avedons stopped making payments on their loan, and Katline sued to collect on the note and to foreclose the mortgage, the

---

[2] This subsection provides that a HOEPA mortgage loan is one, other than a residential mortgage transaction, reverse mortgage transaction, or transaction under an open ended credit plan, that secures a credit transaction with the consumer's principal dwelling and (1) carries an annual percentage rate at the time of the transaction exceeding by more than 10 percentage points the yield on certain specified Treasury securities; or (2) imposes total points and fees which exceed more than 8 percent of the total loan amount or $400. 15 U.S.C. § 1602(aa) (2000).

Avedons, by way of affirmative defense, sought to set-off against any amounts owed to Katline an amount equal to the damages authorized in TILA/HOEPA for these two HOEPA violations. See 15 U.S.C. § 1639(j) (2000) (providing that any mortgage containing a provision prohibited by HOEPA shall be treated as a failure to deliver material disclosures under TILA thereby subjecting the loan transaction to TILA remedies); 15 U.S.C. § 1640(a)(1)-(4) (2000) (providing for an award of actual and statutory damages for both TILA (and therefore HOEPA) violations); 12 C.F.R. § 226.23(a); Martinec v. Early Bird Int'l, Inc., 126 So. 3d 1115, 1118 (Fla. 4th DCA 2012) (confirming that a debtor alleging a HOEPA violation "is entitled to actual and statutory damages under TILA as a defense of recoupment or set-off" against a foreclosure action for collection of a debt, even when an affirmative action for rescission by the debtor would be barred by TILA's statute of limitations).

Katline sought to avoid this defense claiming that savings clauses in its loan documents cured any TILA/HOEPA violations.[3] Katline cited no authority either

---

[3] The promissory note focused primarily on avoiding any penalties should the loan prove usurious:

> Notwithstanding anything to the contrary contained herein and/or within the Mortgage . . . the effective rate of interest on the obligation evidenced by this Promissory Note shall not exceed the maximum effective rate of interest permitted to be paid under the higher of (1) the laws of the State of Florida; or (2) the laws of the United States . . . .

below or here to support its argument that such clauses have application to a HOEPA loan, nor has this court been able to locate any. Rather, we agree with the trial court when it concluded that:

> [A] savings clause disclaiming a violation of a higher interest rate under HOEPA undermines the intent of [Congress] to protect consumers against predatory lending. See 198 A.L.R. Fed 631 (2004) (HOEPA was enacted to prevent lenders from making "high cost mortgage loans to individuals . . . without regard to the individual's income and cash flow to repay the debt").
>
> Likewise, a policy allowing a savings clause to disclaim a violation of TILA for a pre-payment penalty may encourage lenders to include pre-payment penalties since the only penalty, if caught, would be the loss of the pre-payment penalty charges.

We agree with this assessment for a number of reasons. First, because it is consistent with HOEPA's primary goal to protect borrowers from risking the equity in their homes in high-interest/high-risk loan transactions containing hidden costs:

SUBTITLE B: HOME OWNERSHIP AND EQUITY PROTECTION

The mortgage was more expansive and attempted to excuse any violation of law:

> It is agreed that nothing herein contained nor any transaction related hereto shall be construed or so operate as to require the Mortgagor to pay interest at a rate greater that [sic] is now lawful in such case to contract for, or to make any payment or to do any act contrary to law; that if any clauses or provisions herein contained operate or would prospectively operate to invalidate this Mortgage or said promissory note in whole or in part, then such clauses and provisions only shall be held for naught, as though not herein contained, and the remainder of this Mortgage shall remain operative and in full force and effect.

5

## A. INTRODUCTION

. . . .

Legislation is needed to address reverse redlining and to protect borrowers who might enter into home equity scam transactions. . . . Certain loan structures . . . are potentially dangerous when misused. The Committee has acted [in proposing HOEPA] to provide additional consumer protections for these structures.

The bill [adopting HOEPA] amends the Truth in Lending Act to define a class of non-purchase, non-construction, closed-end loans with high interest rates or upfront fees as "High Cost Mortgages." To ensure that consumers understand the terms of such loans and are protected from high pressure sales tactics, the legislation requires creditors making High Cost Mortgages to provide a special, streamlined High Cost Mortgage disclosure three days before consummation of the transaction. The bill also prohibits High Cost Mortgages from including certain terms such as prepayment penalties and balloon payments that have proven particularly problematic. Finally, the bill provides increased civil liability for failure to comply with the requirements for High Cost Mortgages and enables a borrower to assert all claims and defenses against an assignee of the High Cost Mortgages that could be asserted against the originator.

## B. THE REVERSE REDLINING PROBLEM

Mortgages are loans secured by real estate. Most residential mortgages are purchase or construction mortgages, with the proceeds used to finance the purchase or initial construction of the home. "Home equity loans" and "second mortgages," however, are mortgages whose proceeds are not used to purchase or build the home serving as security for the loan. Such "non-purchase money mortgages" are also secured by homes, but the proceeds are characteristically used for purposes such as home improvements or credit consolidation.

Evidence before the Committee indicates that some high-rate lenders are using non-purchase money mortgages to take advantage of unsophisticated, low income homeowners. While individual cases differ, a pattern has emerged in which low income, often elderly homeowners claim that mortgage lenders, brokers, or home improvement contractors have "hustled" them into taking out non-purchase money mortgages with extremely high interest rates, fees, or both. . . . .

Typically, the homeowners have limited incomes but have developed equity in their homes as the result of paying down their first mortgages, inheritance, or the rise in real estate values in the 1980s. The equity provides security for sizeable second mortgage loans. Because the borrowers have little cash flow, however, they must often struggle to meet overwhelming mortgage payments. In some instances, the struggle culminates in the borrower's loss of his or her home through foreclosure.

Evidence suggests that some home improvement contractors, second mortgage brokers, and other lenders act in a "predatory" fashion, targeting unsophisticated, low income homeowners and "skimming" equity from the neighborhoods through high-rate, high fee loans. Mortgage finance companies often purchase the loans which they retain as portfolio investments or resell to banks and other financial institutions.

. . . .

## D. DESCRIPTION OF LEGISLATION

. . . .

### 1.  High cost mortgages

The legislation defines a class of mortgages as "High Cost Mortgages." The bill defines these transactions to be closed-end loans that are not used for acquisition or construction and that have up-front fees or interest rates above the "triggers" in the bill.

. . . .

7

### 6. Prohibited terms

The Committee finds that certain loan terms are particularly problematic and often mislead borrowers about the true cost of a loan. Consequently, the legislation prohibits High Cost Mortgages from containing the following terms: prepayment penalties, points on loan amounts refinanced, default interest rates above the rate prior to the default, balloon payments, negative amortization, or prepayment of more than two of the periodic payments.

S. REP. NO. 103-169, at 21-22, 23, 25 (1993), reprinted in 1994 U.S.C.C.A.N. 1881; see also Lisa Keyfetz, The Home Ownership and Equity Protection Act of 1994: Extending Liability for Predatory Subprime Loans to Secondary Mortgage Market Participants, 18 Loy. Consumer L. Rev. 151, 151-52, 175 (2005) (footnotes omitted) (stating that "[i]n response to evidence of a pattern of abuse in the subprime mortgage market, Congress passed the Home Ownership and Equity Protection Act ("HOEPA" or the "Act") in 1994 . . . [and g]iven the dominant role the secondary market plays in demanding and financing subprime mortgages, HOEPA's drafters focused on the need for a mechanism to hold financiers of predatory lending accountable for the misconduct of their counterparts in the primary mortgage origination market").

Second, we agree with the trial court's assessment because HOEPA, like TILA, is a disclosure law not a usury law and serves an entirely different purpose. The purpose of a usury law is to limit the amount of interest that may be charged as a cost of borrowing money. The purpose of TILA/HOEPA is to provide

8

information up-front to potential borrowers so that they know what they are getting and what they are being charged for getting it. See S. REP. NO. 103-169 at 21 ("Subtitle B does not create a usury limit or prohibit loans with high rates or high fees. . . . The bill amends the Truth in Lending Act to . . . ensure that consumers understand the terms of such [high cost] loans.").

Because the usurious nature of a loan transaction may not become apparent for some time after a loan transaction has been consummated, inclusion of a savings clause in a loan transaction may serve a legitimate purpose in preventing liability for an inadvertent violation of the usury laws:

> [W]e also believe that savings clauses serve a legitimate function in commercial loan transactions and should be enforced in appropriate circumstances. For instance[:]
>
>> [W]here the actual interest charged is close to the legal rate, or where the transaction is not clearly usurious at the outset but only become usurious upon the happening of a future contingency, the clause may be determinative on the issue of intent [to charge more than the legally allowed amount of interest].

Jersey Palm-Gross, Inc. v. Paper, 658 So. 2d 531, 535 (Fla. 1995) (quoting Jersey Palm-Gross, Inc. v. Paper, 639 So. 2d 664, 671 (Fla. 4th DCA 1994)).

But because the purpose of HOEPA and TILA is to provide information up-front so that potential purchasers can assess the true cost of the loan they are about to take, enforcement of a savings clause, which effectively nullifies the obligation to disclose pertinent information, undermines rather that furthers this purpose. See

9

Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412 (1998) ("The declared purpose of the Act is 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing . . . .'" (quoting 15 U.S.C. § 1601(a))).

Thus, in light of the distinct purposes to be served by HOEPA and TILA, the trial court was correct in refusing to find that the savings clauses in Katline's loan documents effectively nullified the mandated disclosures of HOEPA. See 15 U.S.C. § 1639(j) (2000) (providing that any mortgage containing a provision prohibited by HOEPA shall be treated as a failure to deliver material disclosures under TILA thereby subjecting the loan transaction to TILA remedies).

Third, we agree with the trial court's assessment because it is consistent with those portions of HOEPA which recognize only a few instances in which penalties for TILA/HOEPA violations may be avoided. Paragraph 1640(a)(4) of HOEPA, for example, forgives a creditor's failure to comply with HOEPA where the "creditor demonstrates that the failure to comply [with HOEPA] is not material." 15 U.S.C. § 1640(a)(4) (2000). Likewise, subsections 1640(c) and 1640(f) of TILA forgive a creditor for scriveners' errors or for reliance on federal regulators. See 15 U.S.C. § 1640(c) (2000) (generally providing that a creditor may be relieved of liability where a preponderance of the evidence shows that a "violation was not

intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error[, for example,] . . . clerical, calculation, computer malfunction and programing, and printing errors, except [for] error[s] of legal judgment with respect to a person's obligations"); 15 U.S.C. § 1640(f) (2000) (providing that no liability will be imposed for TILA violations when a creditor has acted "in good faith in conformity with any rule, regulation, or interpretation thereof by the Board [of Governors of the Federal Reserve System] or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized . . . to issue such interpretations or approvals").

Notably, none of these provisions suggests that a creditor may receive absolution for failure to make mandatory disclosures as would a savings clause. Moreover, not one of these exceptions finds application here. Including a prepayment penalty or a default interest provision in a HOEPA loan transaction cannot be viewed as not being material because HOEPA expressly provides that it is. See S. REP. NO. 103-169 at 28 ("Failure to provide the High Cost Mortgage disclosure three days before consummation and inclusion of prohibited loan terms . . . are material violations of the Subtitle B of Title I."); 15 U.S.C. §1639(c), (d), (j) (2000) (prohibiting prepayment penalties and default interest in HOEPA loan transactions and providing that any mortgage containing these prohibited

11

provisions "shall be deemed a failure to deliver the material disclosures required under this subchapter").

Nor can the prepayment penalty and default interest provisions included in Katline's loan documents be viewed as clerical or printing errors. On default, Katline repeatedly demanded, in strident terms, payment of the maximum amount due on the loan as well as default interest and a prepayment penalty. Including these provisions in Katline's loan documents was no mistake. Moreover, Katline neither claimed below nor adduced any evidence that it was attempting to conform to a rule or regulation by the Board of Governors of the Federal Reserve System either by including these provisions in its loan documents or by including savings clauses in its documents in an attempt to absolve itself of liability for including these provisions.

Thus, while a savings clause may serve a useful purpose in avoiding the harsh consequences of a loan transaction which inadvertently turns out to be usurious after all of the math is done, the presence of such clauses in a HOEPA loan in no way relieves the offending party of its liability for the violation of the provisions of this disclosure law. For these reasons we agree with the trial court's assessment that the savings clauses included in Katline's loan documents cannot, and do not, negate Katline's liability for violating TILA/HOEPA's disclosure mandates.

Although we agree that the penalties imposed by TILA and HOEPA must be assessed in this case, we do not agree to the determination made below as to the amount which should be set-off against the outstanding $31,566.59 balance of the Katline loan. Under 15 U.S.C. § 1640, a creditor who fails to comply with the HOEPA amendment to TILA is liable for (1) actual damages sustained as a consequence of the creditor's failure; (2) twice the amount of any finance charge made in connection with the transaction not to exceed $2000 in the case of an individual action on a non-open ended credit plan[4]; (3) costs including any reasonable attorney's fees incurred in prosecuting a successful HOEPA action or defense; and, (4) an amount equal to all finance charges and fees paid:

> 1640. Civil liability
>
> (a) Individual or class action for damages; amount of award; factors determining amount of award
>
> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
>
> (1) any actual damage sustained by such person as a result of the failure;

---

[4] The term "open end credit plan" is defined as a plan "under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(i) (2000).

13

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000, or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000 . . . .

. . . .

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court; and

(4) in the case of a failure to comply with any requirement under section 1639 of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material. . . . .

15 U.S.C. § 1640(a)(1)-(4) (2000).

The Avedons admitted below that they had incurred no actual damages as a consequence of Katline's HOEPA violations. The trial court correctly determined that the Avedons had incurred $33,240.45 in finance charges and that these charges should be set-off against the outstanding balance of the loan.[5] See 15 U.S.C. § 1605(a)(1)-(6) (2000) (defining the term "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is

---

[5] The evidence was that the Avedons had paid $30,115.45 in interest and $3,025.00 in other finance charges for a total of $33,240.45.

extended" and includes interest, any amounts payable under a point, discount, or other system of additional charges; service or carrying charge; loan or finder's fees and similar charges; investigation or credit report charges; insurance premiums against credit loss or default; and mortgage broker fees); 15 U.S.C. § 1640(a)(4) (2000).

However, the trial court erred when it set-off, or deducted, double the amount of the finance charges paid by the Avedons from the loan balance under 15 U.S.C. § 1640(a)(2)(A) (2000). While this subparagraph does initially state that in an action by an individual the amount of the recovery is "twice the amount of any finance charge," see 15 U.S.C. § 1640(a)(2)(A)(i), this same subparagraph also in clause (iii) expressly caps that recovery in cases involving HOEPA loans at $2000:

> (2)(A) . . . (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000 . . . .

15 U.S.C. § 1640(a)(2)(A)(iii) (2000); Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 62 (2004) ("The specification of statutory damages in clause (i) [of section 1640(a)(2)(A)] of twice the finance charge continues to apply to loans secured by real property as it does to loans secured by personal property. Clause (iii) [of section 1640(a)(2)(A)] removes closed-end mortgages from clause (i)'s governance only to the extent that clause (iii) prescribes $200/$2,000 brackets . . . .") (footnote omitted). Therefore, under this provision, only up to $2000 and not

$66,480.90 as the trial court determined may be set-off against the $31,566.59 owed to Katline.

Although the estate is not entitled to deduct double the amount of the finance charge that the Avedons paid on the loan from the balance due, the estate is entitled under paragraph 1640(a)(4) to deduct the entire amount of all of the finance charges imposed ($33,240.45), from the amount due. See 15 U.S.C. § 1640(a)(4) (2000); In re Williams, 291 B.R. 636, 664 (E.D. Pa. 2003) ("The statutory damage provision contained in § 1640(a) was amended to increase the total award to the consumer in the case of HOEPA violations. See 15 U.S.C. § 1640(a)(4). Besides the standard TILA penalty [under 1640(a)(2)(A)], the consumer 'may also recover an amount equal to the total finance charges and fees paid [under § 1640(a)(4)].'" (quoting Newton v. United Cos. Fin. Corp., 24 F. Supp.2d 444, 451 (E.D. Pa. 1998))). The Avedons also are entitled to set-off from the amount due their attorneys' fees and costs. See 15 U.S.C. § 1640(a)(3) (2000).

Finally, in recalculating the amounts to which the estate is entitled to set-off against the amount due, the court below must also credit to Katline the amounts it paid to third parties on the Avedons' behalf for property taxes and insurance premiums. See Lippner v. Deutsche Bank Nat'l Trust Co., No. 07 C 448, 2008 WL 4200654, at *5 (N.D. Ill. Sept. 9, 2008) (confirming that lender was entitled to credit for payment of mortgage insurance and real estate taxes paid on behalf of the

borrower); <u>Moore v. Cycon Enters., Inc.</u>, No. 04-CV-800, 2007 WL 475202, at *8 (W.D. Mich. Feb. 9, 2007) (same).

Accordingly, we affirm the trial court's determination that Katline's savings clauses did not effectively nullify Katline's HOEPA violations so as to avoid imposition of TILA/HOEPA penalties; however, we reverse and remand this cause for a proper calculation of the set-off the estate should receive against the remaining unpaid principal balance on the loan.

Reversed and remanded with instructions.